**In re Leroy BOHNE and Terri Bohne, Debtors.**

**Bankruptcy No. 85–05684.**

United States Bankruptcy Court, D. North Dakota.

Dec. 5, 1985.

**462**

Malcolm Brown, Mandan, N.D. for First Nat. Bank of Hettinger.

James Coles, Bismarck, N.D. for debtors.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

On November 12, 1985, the Debtors, Leroy Bohne and Terri Bohne brought a Motion for Use of Cash Collateral. By their Motion the Debtors wish to use the cash collateral proceeds derived from the sale of livestock. The First National Bank of Hettinger ("bank") holds a security interest in the proceeds and has objected, believing its interest will not be afforded adequate protection. The matter came on for expedited hearing on November 19, 1985.

## FINDINGS OF FACT

The Debtors operate a stock cattle operation near Scranton, North Dakota. They filed for relief under Chapter 11 of the Bankruptcy Code on November 8, 1985. Their indebtedness to the bank as of the date of the hearing was $378,836.00 in principal and $42,844.00 in accrued interest. As security for said debt the bank in 1983 was extended a security interest in all equipment now owned or hereafter acquired; all livestock, now or hereafter acquired together with the young and produce thereof; all feed, seed, fertilizer and other supplies now owned or hereafter acquired.

On November 13, 1985, the Debtors sold 236 calves and 26 heiferettes for the sum of $71,520.86. They acknowledge the bank has a first lien on all animals sold as well as proceeds. In order to maintain their remaining livestock through April, 1986, the Debtors will need $37,890.00, the only source for which is a portion of the sale proceeds. The Debtors have remaining on hand 228 calves, 244 heiferettes, 11 bulls and 200 cows. They anticipate a 1986 calf crop to be in the area of 420 head with minimal death loss over the winter. According to the Debtors, the new calves if held until the optimum summer market will be worth $300 per head for an anticipated total of $126,000.00. The exact market price in 1986, of course, is not known nor was there any testimony regarding the expenses the Debtors would likely incur as a consequence of raising the calves between April, 1986 and market time. As adequate protection for the use of the bank's cash collateral, the Debtor's have offered a replacement lien in the 1986 calves.

## CONCLUSIONS OF LAW

The bank argues that by virtue of its security interest in livestock and their young it has a preexisting security interest in the 1986 calf crop and consequently the Debtors' offer of adequate protection is amorphous. The Debtor's take the position that the 1986 calves should be likened to after-acquired property and therefore are not subject to the bank's pre-petition lien. Alternatively, they assert that any interest the bank may have in the 1986 calves should be offset by a § 506(c) claim for the reasonable costs and expenses incurred in raising the calves to market.

1.

§ 363(e) of the Bankruptcy Code provides that whenever a debtor proposes to use property of the estate in which a creditor has an interest the Court shall on request, of the creditor, "prohibit or condition such use ... as is necessary to provide

adequate protection for such interest." As to the issue of adequate protection, the burden rests with the Debtor. 11 U.S.C. § 363(*o*)(1). An offer of adequate protection must as nearly as possible under the circumstances of the case provide the creditor with the value of its bargained for rights consistent with the concept of indubitable equivalence. *In re Martin,* 761 F.2d 472 (8th Cir.1985); *In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984); *In re Magnus,* 50 B.R. 241 (Bkrtcy.D.—N.D.1985). In assessing an offer of adequate protection the Court must determine the value of secured creditor's interest; the risks to that value that will result from the Debtor's use of the property; and most importantly, whether the proposed adequate protection truly provides protection from that risk. If as the bank claims, it has a continuing interest in the 1986 calf crop, then without even reaching the question of indubitable equivalence, those animals cannot serve as adequate protection for the use of the bank's cash collateral.

█ Our first inquiry then must be to discern exactly what the nature and extent of the bank's security interest is. There is no dispute that the bank, prior to the Debtor's Chapter 11 Bankruptcy Petition, received a valid security interest in *all livestock now or hereafter acquired together with the young and produce thereof.* Filing of a bankruptcy petition affects the degree to which a pre-petition security interest survives postpetition. § 552 of the Code provides:

(a) Except as provided in Subsection (b) of this section, property acquired by the estate or by the Debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the Debtor before the commencement of the case.

(b) Except as provided in § 363, 506(c), 522, 544, 545, 547 and 548 of this title, if the Debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the Debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by the security agreement and by applicable non-bankruptcy law, except to any extent that the Court, after notice and a hearing and based on the equities of the case, orders otherwise.

§ 552(a) operates to avoid any security interest given by the Debtor in property which is not acquired by the Debtor until after commencement of the bankruptcy case. The otherwise all pervasive effect of this section is qualified by § 552(b). Generally a creditor retains under § 552(b) a postpetition interest in proceeds, products and offspring of property in which it acquired an interest prior to the commencement of the bankruptcy case. This Court in past decisions has construed § 552(b) in the context of a security interest running to farm products. In the case of *In re Thomas,* 38 B.R. 50 (Bkrtcy.—N.D.1983). The creditor was extended an interest in all farm products. Similarly the case of *In re Pigeon,* 49 B.R. 657 (Bkrtcy.D.—N.D.1985) was concerned with whether a security interest in farm products would continue in milk produced post-petition. The issue in that case was whether the term "products" employed in § 552(b) should be construed to include farm products such as milk. This Bankruptcy Court concluded that the term "products" under § 552(b) should, in light of the legislative history, be limited to those instances where the nature of the creditor's pre-petition collateral is itself altered so substantially as to be transformed into new property. Milk, we concluded, was not a product of livestock in the sense that the livestock's identity had been subsumed by the creation of the milk. The United States District Court for this district reached a contrary result in *In re*

*Nielsen,* 48 B.R. 274 (D.N.D.1984) concluding that a security interest in farm products now owned or hereafter acquired operates by virtue of § 552(b) to afford a creditor a security interest in milk acquired post-petition. This Court and the District Court in the foregoing cases were dealing with a term, the meaning of which is not clear and which Congress suggested was meant to cover any property into which property subject to the security interest had been converted. H.R.Rep. No. 595, 95th Cong. 1st Sess. 376–377 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6332, 6333. There is room for disagreement on the meaning of the terms, "product" or "proceeds" as used in § 552(b) because incorporation of either of them in a security agreement could operate by an expansive reading of § 552(b) to "in large measure" negate § 552(a)'s prohibition against a continuing interest in after-acquired property. The District Court for this District, however, by its *Nielsen* decision believes that § 552(b) is unambigious even as to those terms and must be strictly construed in favor of a creditor who holds a security interest in proceeds generated from pre-petition collateral. While this Bankruptcy Court may yet find disagreement with the District Court in its interpretation of the terms, products and proceeds, it agrees that where § 552(b) is clear in its meaning it must be given effect because, except as modified by § 552(b), a secured creditor has the right under law to have the value of its interest in collateral preserved throughout the bankruptcy proceeding.

■ § 552(b) provides that a valid pre-petition security interest in pre-petition property and the offspring of such property operates to continue that security interest in offspring acquired subsequent to the bankruptcy petition. Calves are offspring of livestock and the bank's pre-petition interest in *livestock now or hereafter acquired together with the young and produce thereof,* is sufficiently clear language to cause the bank's pre-petition interest in livestock to extend to any 1986 calves which are offspring of pre-petition livestock. § 552(a) of course would operate to

avoid the post-petition affect of the bank's security interest in any new livestock acquired by the Debtor's post-petition and which would not otherwise constitute offspring of pre-existing animals. Arguably, if the bank's security interest made no mention of the young but rather only referred to the produce of livestock, this Court in line with its previous decisions might well have concluded that the term "produce" was not meant to include post-petition calves.

In view of the conclusion reached, the Court must conclude that the Debtor's offer of adequate protection fails to meet the requirements of *Martin.*

2.

The 1986 calf crop although born in April will not acquire any great value until they are raised through the Debtor's efforts to market weight later that summer. The Debtors argue on the basis of § 506(c) that their costs and expenses incurred in preserving the calves until market gives them a claim which more than offsets the value of the bank's interest. The bank charges that maintaining the livestock will be of no particular benefit to it and that the Debtors should proceed to liquidate their livestock immediately.

■ § 506(c) allows the trustee or a debtor in possession to recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim. Recovery under the foregoing section requires more than a speculation as to possible benefit. *Dozoryst v. First Financial Savings and Loan of Downer's Group.* 21 B.R. 392 (D.C.N.D. Ill.1982) a similar claim in the form of a counter-claim was advanced by debtors in the case of *Brookfield Production Credit Ass'n. v. Borron,* 36 B.R. 445 (D.C.E.D.Mo. 1983). In that case the Debtors contended that the costs and expenses incurred by them in feeding cattle and turkeys secured to the P.C.A. enhanced their value and

should entitle them to an offset. The Court in Brookfield concluded:

> "To recover, the debtor-in-possession must expend the funds primarily to benefit the creditor, who must in fact directly benefit from the expenditure. *In re Sonoma V*, 24 B.R. 600 (Bkrtcy.App. 9th Cir.1982). Expenses undertaken to improve the position of the Debtor in possession, although indirectly benefiting the creditor, are not recoverable. *In re Codesco, Inc.*, 18 B.R. 225 (Bkrtcy.S.D.N. Y.1982). Several courts require the debtor in possession or trustee to establish a quantifiable, rather than qualitative or speculative, benefit. See, e.g., *In re Flagstaff Foodservice Corporation*, 29 B.R. 215 (Bkrtcy.S.D.N.Y.1983). In sum, courts construing § 506(c) appear to require the debtor in possession, who bears the burden of proving benefit, to show that absent to costs expended the property would yield less to the creditor than it does as a result of the expenditure, although the provision does not expressly impose such a requirement. *Dozoryst supra.*"

The *Brookfield* case was affirmed by the 8th Circuit on appeal and is thus the law of the Circuit on this issue. *Brookfield Production Credit Ass'n. v. Borron*, 738 F.2d 951, (8th Cir.1984). See also *In re West Post Road Properties Corp.*, 44 B.R. 244 (Bkrtcy.S.D.N.Y.1984), holding that administrative expenses are chargeable to secured creditors only where the expenses of preservation are incurred *primarily* for the benefit of the secured interest or where the secured creditor caused or consented to such expenses. In an earlier case the 8th Circuit recalled the general rule that a debtor has an independent duty to protect and conserve property in his possession for the benefit of creditors. *Matter of Halux, Inc.*, 665 F.2d 213 (8th Cir.1981). Thus, any claimed benefit enuring to the bank in the instant case must be more than what would incidentally occur as a result of the debtor's independent duty to reasonably care for the 1986 calves.

In the instant case it is the Debtors, not the bank, who wish to carry the 1986 calves through the spring and into summer. Presumably the Debtors hope to profitably market the calves thereby benefiting themselves. Any benefit to the bank as secured creditors is only incidental under the *Brookfield* standards and thus does not give rise to an offset under § 506(c).

Accordingly and for the reasons stated, the Motion by the Debtors for use of cash collateral is in all things DENIED.

SO ORDERED.