In re Emanuel SALZMAN, Debtor.

In re William HAMLIN, Debtor.

Robert B. SCHINDLER, as Trustee in Bankruptcy of Emanuel Salzman, Plaintiff,

v.

Irene SHARAK, Individually and as Executrix or Administratrix of the Estate of Michael T. Sharak, Deceased, J.A.M. Company, et al., Defendants.

J.A.M. COMPANY, Putnam Professional Park Real Estate Account & Alan S. Poritzsky, P.C. Retirement Trust, Plaintiff,

v.

Robert B. SCHINDLER as Trustee in Bankruptcy of Emanuel Salzman, Susan Hamlin and Gloria Salzman, Defendants.

Bankruptcy Nos. 83B20134, 83B20068. Adv. Nos. 84–6007, 84–6088.

United States Bankruptcy Court, S.D. New York.

Feb. 17, 1988.

Edward P. Miller, Miller and Farrell, Hartsdale, N.Y., for J.A.M. Co.

Robinowitz, Bianchi & Cohlan, White Plains, N.Y., for Putnam.

Robert B. Schindler, New York City, for trustee.

Garrity, Connolly, Lewis, Lowry & Grimes, New York City, for fourth mortgagees.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The trustee in bankruptcy in the jointly administered Chapter 7 cases of Emanuel Salzman and William Hamlin ("the debtors") opposes the adversary proceedings commenced by the holders of second and third mortgages against real estate owned by the debtors, which seek to compel the trustee to make payment to the second and third mortgagees from the proceeds of the trustee's sale of the real estate. The fourth mortgagees, who are the wives of the debtors, have been joined as defendants and have asserted in their answers that the second and third mortgages are void and that the fourth mortgage is superior to the second and third mortgages, with the result that the proceeds from the trustee's sale should be applied towards the payment of the fourth mortgage. The trustee in bankruptcy also contests the fourth mortgage on the ground that it was obtained by the debtors' wives for insufficient consideration and is voidable as a fraudulent transfer. Additionally, the trustee seeks to hold the second and third mortgagees liable for a proportionate part of the expenses attributable to his administration of the real estate pursuant to 11 U.S.C. § 506(c). The adversary proceedings commenced by the second and third mortgagees were tried separately. The trustee's challenge directed to the propriety of the fourth mortgage will be heard after the validity of the second and third mortgages is determined.

### FINDINGS OF FACT

1. On February 9, 1983, the debtor, William Hamlin, filed with this court his voluntary petition under Chapter 7 of the Bankruptcy Code and an order for relief was then entered.

2. On March 15, 1983, the debtor, Emanuel Salzman, filed with this court his voluntary petition under Chapter 7 of the Bankruptcy Code and an order for relief was then entered.

3. The debtors, Emanuel Salzman and William Hamlin, were the president and secretary, respectively, of BFM Printing Corp. ("BFM"), a corporation engaged in the printing business in Croton-on-Hudson, New York. They were also the sole shareholders of BFM, which they formed in 1976. *See Chrysler Capital Corp. v. Salzman* and *Chrysler Capital Corp. v. Hamlin (In re Salzman)*, 61 B.R. 878 (Bankr.S.D.N.Y.1986).

4. Pursuant to Bankruptcy Rule 1015, the bankruptcy cases of Salzman and Hamlin were consolidated for joint administration by the same trustee who was appointed in each case.

5. The debtors, Salzman and Hamlin, were the owners of a building and the real estate on which the building was located in the Town of Cortland, in Westchester County, New York. This property was used by the debtors' corporation, BFM, for the operation of its business.

6. Pursuant to an order of this court, dated March 5, 1984, the trustee was authorized to sell the debtors' real estate for $170,000.00, free and clear of all liens and

encumbrances, with such liens and encumbrances to attach to the gross proceeds of the sale. From the proceeds of $170,000.00, the trustee was authorized to pay the principal balance due to a first mortgagee in the sum of $25,000, together with interest thereon, until the date of payment.

7. The plaintiff, J.A.M. Company ("J.A.M."), asserts a secured claim against the proceeds held by the trustee on the ground that it has a second mortgage against the real estate in question in the principal sum of $50,000, plus interest at the rate of 24% per annum from the date of the last payment which was September 1, 1982, together with counsel fees.

8. The plaintiffs, Putnam Professional Park Real Estate Account and Alan S. Poritsky, P.C. Retirement Trust ("Putnam"), assert a secured claim against the proceeds of sale on the ground that Putnam held a third mortgage against the real estate in question in the principal sum of $25,000, plus interest at the rate of 22% per annum from September 1, 1982, together with counsel fees.

### The J.A.M. Mortgage

9. In late 1979 or early 1980, the debtor, Emanuel Salzman, had a conversation with Herman Poritsky, a mortgage broker. Salzman informed Herman Poritsky that BFM wanted to borrow money for business purposes. Apparently BFM could not obtain additional financing through the banks with which it dealt. Herman Poritsky informed Salzman that the loan should be collateralized by real estate. It was agreed that as officers and shareholders of BFM, the debtors, Salzman and Hamlin, would be willing to collateralize the loan to BFM by mortgaging the real estate and building which they jointly owned and which was used by BFM as its business location.

10. Herman Poritsky thereafter contacted Stanford Joseph, an attorney with whom Poritsky had previous dealings and who represented clients willing to invest in junior mortgages on real estate. Joseph then contacted a client named Robert Abrams, who operated a company called J.A.M. Company, which made investments in second mortgages on commercial real estate. Joseph asked Abrams if J.A.M. would be willing to invest $50,000 in a second mortgage on commercial real estate. Abrams responded positively. Abrams never met with, or had any discussions with BFM or its principals, Salzman and Hamlin, and never attended the closing.

11. Joseph then informed the mortgage broker, Herman Poritsky, that he had a second mortgage source willing to advance a collateralized $50,000 loan. Herman Poritsky informed Joseph that the borrowers would like to obtain a $75,000 loan and, therefore, the broker would have to look for another source willing to invest in a subordinate loan of $25,000 in order to make up the difference.

12. On May 8, 1980, the first transaction with respect to the J.A.M. second mortgage loan of $50,000 took place at the office of BFM. Hamlin, as secretary of BFM signed and issued a corporate resolution adopted by the board of directors of BFM authorizing it to borrow $50,000 from J.A.M. and to issue a promissory note to J.A.M. for $50,000. [Exhibit # 1]. The loan papers were prepared by Stanford Joseph, who attended the closing at BFM's office.

13. Pursuant to a corporate note dated May 8, 1980, BFM promised to pay to J.A.M. of 41 East 42nd Street, New York, New York, the sum of $50,000, on October 31, 1980, with interest at the rate of 24% per annum. The interest payments were to be made on a monthly basis in the amount of $799.99 each month. [Exhibit # 2]. The promissory note also contained a 15% charge for legal fees, with a minimum of $1500.00, if collection efforts were incurred as a result of a default in payment. Additional late charges were also included in the note.

14. As collateral for the J.A.M. loan of $50,000 to BFM, the debtors Salzman and Hamlin, executed and delivered to Stanford

Joseph for the second mortgagee, J.A.M., a mortgage in the sum of $50,000 in favor of J.A.M., as second mortgagee, which covered the real estate owned by Salzman and Hamlin, and occupied by BFM. [Exhibit # 3]. The mortgage was recorded on May 12, 1980 in the office of the Clerk of Westchester County, New York. The mortgage specifically referred to the corporate note executed by BFM. The mortgage also included a charge for legal fees in the event counsel is retained for foreclosure. The charge was specified as 15% of the balance, but not less than $1500, together with late charges of 2% per month.

15. Additionally, the debtors Salzman and Hamlin executed and delivered for the benefit of the mortgagee, J.A.M., their promissory mortgage note, dated May 8, 1980, payable to J.A.M. in the sum of $50,-000, as collateral security for the $50,000 loan by J.A.M. to BFM. [Exhibit # 4]. The promissory note is blank as to any interest on the principal $50,000 sum. However, the mortgage note states that it was given as collateral security for the $50,000 loan made to BFM by J.A.M. "bearing even date herewith."

16. As part of the loan transaction, and in order to induce J.A.M. to make a $50,000 loan to BFM, Salzman and Hamlin executed a continuing guaranty, dated May 8, 1980 wherein they jointly and severally guaranteed payment to J.A.M. for all amounts owed to it by BFM, together with attorneys' fees and collection costs. [Exhibit # 5]. The guaranty expressly authorized J.A.M., without further notice or consent, to extend the time of payment of any portion of the debt owed by the debtors or the time of performance or payment of any collateral securing the $50,000 loan.

17. Pursuant to a written authorization signed by Hamlin, as secretary of BFM, J.A.M. was instructed to make certain disbursements from the proceeds of the $50,-000 loan. [Exhibit D]. The sum of $3,500 was to be paid to Herman Poritsky, the mortgage broker who obtained the loan for BFM; $350 was to be paid to Stanford Joseph, the attorney who prepared the loan papers, and $46,150 was to be paid to BFM,

representing the balance of the $50,000 loan. These checks were issued by J.A.M., all dated May 8, 1980, for the amounts specified. [Exhibits B, C and D].

18. Thereafter, BFM sought to extend the time for repayment of the $50,000 J.A.M. loan, from the original due date of October 31, 1980 to April 30, 1980. On November 13, 1980, Hamlin, as secretary of BFM, signed and issued a corporate resolution adopted by the Board of Directors of BFM authorizing it to extend the time of payment of the J.A.M. $50,000 loan to April 30, 1980. [Exhibit # 6].

19. Pursuant to a corporate note dated November 1, 1980, which was signed by BFM's president, Salzman, and which was acknowledged before a notary public on November 13, 1981, BFM issued another promissory note to J.A.M. in the sum of $50,000, payable on April 30, 1981, with interest at the rate of 22% per annum. [Exhibit # 7]. Except for the reduced interest rate, the corporate note was substantially the same as the previous note. [Exhibit # 2].

20. In accordance with an extension agreement dated November 1, 1980, which was signed by Salzman, Hamlin, and Robert Abrams for J.A.M., the parties agreed to extend the $50,000 mortgage indebtedness of Salzman and Hamlin until April 30, 1981, provided that Salzman and Hamlin shall continue to guarantee the corporate note of BFM. [Exhibit # 8]. The extension agreement was recorded in the office of the Westchester County Clerk on December 19, 1980.

21. Pursuant to a second extension agreement dated May 18, 1981, Salzman, Hamlin and Robert Abrams for J.A.M. agreed to extend the $50,000 mortgage debt a second time to May 31, 1982, provided that Salzman and Hamlin shall continue to guarantee the corporate note of BFM to J.A.M. [Exhibit # 10]. The extension agreement was recorded in the office of the Clerk of Westchester County on August 20, 1981.

22. A corporate resolution of BFM authorizing the extension of the $50,000 loan

was executed on May 18, 1981. [Exhibit # 9].

23. Pursuant to another corporate note dated May 18, 1981, BFM, by its president, Salzman, agreed to pay to J.A.M. the sum of $50,000 which was due on May 31, 1982. [Exhibit # 11]. Except for the fact that the interest rate was increased from 22% per annum up to the rate of 24% per annum, as contained in the original corporate note, the terms and conditions of this corporate note were substantially the same as those in the two previous notes. [Exhibits # 2 and # 7].

### The Putnam Mortgage

24. In view of the fact that BFM originally wanted to borrow $75,000, and because J.A.M. was willing to advance no more than $50,000 to BFM, the mortgage broker, Herman Poritsky, then approached the other plaintiffs in this case for the purpose of obtaining a $25,000 subordinated mortgage loan for BFM. These plaintiffs are Putnam Professional Park Real Estate Account and Alan S. Poritsky, P.C. Retirement Trust, (collectively referred to as "Putnam"). The Putnam plaintiffs are also investors in junior mortgages collateralized by commercial real estate. The two Putnam principals are brothers of the mortgage broker, Herman Poritsky.

25. Pursuant to a corporate note dated November 13, 1980, BFM promised to pay to Putnam on April 30, 1981, the sum of $25,000, with interest at the rate of 22% per annum. [Exhibit # 16]. Monthly interest payments were to commence on December 1, 1980 in the amount of $274.99 each month. The corporate note expressly states that it is secured by a mortgage made by the guarantor to the payee on real estate in the Town of Cortland, Westchester County, New York.

26. Hamlin, as secretary of BFM, signed a corporate resolution of BFM, dated November 13, 1980, reflecting the fact that the board of directors of BFM authorized the corporation to borrow $25,000 from the Putnam plaintiff. [Exhibit # 17].

27. On November 13, 1980, Salzman and Hamlin signed a continuing guaranty in favor of Putnam for the $25,000 mortgage loan by Putnam to BFM. [Exhibit # 18]. This guaranty was substantially similar to the guaranty which Salzman and Hamlin issued on May 8, 1980 to support the J.A.M. loan to BFM. The guaranty authorized Putnam without further notice or consent, to extend the time of payment of any portion of the debt owed by the debtors to Putnam, or the time of performance or payment of any collateral securing the $25,000 loan.

28. As part of the mortgage loan transaction, and as collateral for the $25,000 loan from Putnam to BFM, the debtors Salzman and Hamlin, executed and delivered to Stanford Joseph for the Putnam mortgagees, a $25,000 third mortgage in favor of Putnam on the real estate owned by Salzman and Hamlin and occupied by BFM, in the Town of Cortland, Westchester County New York. [Exhibit # 19]. The mortgage was recorded on August 20, 1981 in the office of the Clerk of Westchester County, New York. The mortgagee referred to the corporate note executed by BFM. The mortgage included a 15% charge for legal fees in the event counsel is retained for foreclosure, but not less than $1500.00, together with late charges of 2% per month.

29. The debtors, Salzman and Hamlin, also executed and delivered for the benefit of the mortgagee, Putnam, their promissory mortgage note, dated November 13, 1980, payable to Putnam, in the sum of $25,000, as collateral security for the $25,000 loan by Putnam to BFM. [Exhibit # 20]. As in the case of the promissory note that the debtors gave to J.A.M. [Exhibit # 4], this promissory note is blank as to any interest on the principal $25,000 sum. The mortgage note states that it was given as collateral security for a $25,000 loan made to BFM by Putnam and "bearing even date herewith."

30. In a letter addressed to Putnam, dated November 13, 1980, Salzman, as president of BFM, directed Putnam to make the following disbursements from the proceeds of the $25,000 loan:

$ 435.00 to Kenneth Pregno Agency Ltd., the title company.

2,250.00 to Herman Poritsky, the mortgage broker.

350.00 to Stanford Joseph, the attorney who prepared the papers for the loan transaction.

21,965.00 to BFM as the balance of the $25,000.00 loan.

[Exhibit # 22].

31. Pursuant to an extension agreement, dated May 18, 1981, Putnam and the debtors agreed to extend the time for repayment of the $25,000 loan from the original due date on April 30, 1981 to May 31, 1982, provided that Salzman and Hamlin shall continue to guarantee the corporate note of BFM. [Exhibit # 26]. The extension agreement was recorded in the office of the Westchester County Clerk on August 20, 1981.

32. In accordance with a corporate note dated May 18, 1981, which was signed by BFM's secretary, Hamlin, which was acknowledged before a notary public on May 18, 1981, BFM issued another promissory note to Putnam in the sum of $25,000, payable on May 31, 1982, with interest at the rate of 22% per annum. [Exhibit # 25]. This corporate note was substantially the same as the previous note. [Exhibit # 16].

### Default

34. In a letter dated November 15, 1982, Stanford Joseph informed BFM that the $50,000 loan from J.A.M. and the $25,000 loan from Putnam were declared to be in default due to non-payment of the amounts due on October 1, 1982, and November 1, 1982. [Exhibit # 13]. Demand was made for the full outstanding principal balances, plus interest from September 1, 1982, at the rates specified in the corporate notes.

35. The trustee and the fourth mortgagees presented no evidence to show that the fees paid by BFM to Herman Poritsky for his services as the mortgage broker who obtained the J.A.M. and Putnam loans for BFM, which the debtors guaranteed and collateralized with mortgages on their real estate, inured in any way to the bene-

fit of the mortgagees as additional interest or charges. The mortgage fees were earned by Herman Poritsky as mortgage broker and were paid to him pursuant to the written authorizations from BFM that the mortgagees should issue separate checks to Herman Poritsky from the proceeds of the loan.

36. Similarly, the trustee and the fourth mortgagees failed to establish that the legal fees paid by BFM to Stanford Joseph for preparing the loan and mortgage papers inured in any way to the benefit of the mortgagees as additional interest or charges. The legal fees were paid by BFM to Stanford Joseph pursuant to the written authorizations from BFM that the mortgagees should issue separate checks to Stanford Joseph from the proceeds of the loan.

37. There is no dispute that the J.A.M. second mortgage and the Putnam third mortgage are in default and that the mortgagees were entitled to proceed with foreclosure actions had the debtors not filed their bankruptcy petitions with this court. However, there was no evidence to show that the mortgagees ever requested the trustee to administer the real estate covered by their mortgages or that the second and third mortgagees preferred to have the trustee sell the property rather than allowing them to foreclose on their mortgages.

### DISCUSSION

#### 1. The Mortgages

The charge of criminal usury raised by the trustee and the fourth mortgagees has not been sustained. There was no proof that the legal fees charged for preparing the loan transactions, or the brokerage fees collected by the mortgage broker, inured to the benefit of the second and third mortgagees. Although the attorney who prepared the loan and mortgage documents and the broker who obtained the mortgages had previous dealings with the mortgagees, there was no credible evidence to dispute their independence. Therefore, the legal fees and brokerage charges incurred in the mortgage transactions cannot

be added to the interest charged by the second and third mortgagees in order to sustain a claim for criminal usury. Where the rate of interest does not exceed twenty-five percent per annum, there is no criminal usury. N.Y. Penal Law §§ 190.40 and 190.42. Moreover, except under certain circumstances not applicable here, the defense of usury is not available to corporations. N.Y. General Obligations Law § 5–521.

■ The trustee and the fourth mortgagees also contend that because the J.A.M. and Putnam mortgages and mortgage notes are blank as to interest rates, no interest may be added to the principal mortgage indebtedness. This argument ignores the fact that both mortgages and mortgage notes specifically make reference to the fact that the mortgages were given as collateral security for the individual debtors' liabilities under their continuing guarantees of the corporate obligations of BFM under the corporate notes. The corporate notes did provide for interest. Moreover, the corporate loans were specifically mentioned in the mortgagees and mortgage notes which were given at the same time as collateral for the corporate loans. In fact, the mortgage notes were superfluous because the debtors were personal guarantors of their corporation's liability under the corporate notes, which did provide for specific rates of interest. The event of their liability was determined by the corporate notes which the debtors guaranteed. The corporate notes were specifically referred to and incorporated in the mortgages which collateralized the debtors' obligations.

[A]ll contemporaneous instruments between the same parties relating to the same subject matter are to be read together and interpreted as forming part of one and the same transaction.

*Evans Prods. Co. v. Decker,* 52 A.D.2d 991, 992, 383 N.Y.S.2d 457 (3rd Dep't 1976). The mortgage incorporates by reference the BFM note which was executed simultaneously with the mortgage and the debtors' guarantees. *TBS Enterprises, Inc. v.*

*Grobe,* 114 A.D.2d 445, 494 N.Y.S.2d 716 (2d Dep't 1985).

■ The trustee and the fourth mortgagees also contend that there are no mortgages to collateralize the extension agreements. On November 1, 1980, BFM issued another promissory note payable to J.A.M. on April 30, 1981. The debtors and J.A.M. entered into an extension agreement, dated November 1, 1980, extending the mortgage indebtedness to April 30, 1981. A second extension agreement and a corporate note were executed on May 18, 1981, extending the J.A.M. mortgage debt to May 31, 1982. However, no new mortgage was executed in favor of J.A.M. each time that an extension agreement and a corporate note were executed. Similarly, on May 18, 1981, the Putnam mortgagee agreed to extend the repayment of the corporate obligation which the debtor's guaranteed to May 31, 1982. Another corporate note was issued on May 18, 1981, but the debtors did not execute another mortgage in favor of Putnam.

The trustee's and the fourth mortgagees' contention overlooks the fact that the debtors' personal liability to J.A.M. and to Putnam arose out of their continuing guarantees of their corporation's obligations to J.A.M. and Putnam and not as a result of the BFM notes. Each time BFM's obligation under a note was extended by agreement with the issuance of a new note, the debtors' liabilities were similarly extended as a result of their continuing guarantees. The guarantees specifically authorized the mortgagees to extend repayment of the corporate obligations without further notice to the debtors. The mortgages which the debtors executed in favor of J.A.M. and Putnam were intended to collateralize their corporation's indebtedness which the debtors personally guaranteed. The execution of a new mortgage was not required as long as the debtors were personally liable under the extension agreements which they signed. *See Gross v. Lichtman,* 55 A.D.2d 670, 390 N.Y.S.2d 182 (2d Dep't 1976); *Casten v. Tannenbaum,* 42 Misc.2d 118, 246 N.Y.S.2d 954 (1964); *Ginsburg v. Kingston Savings Bank,* 272 A.D. 99, 69 N.Y.S.2d 443 (1st Dep't 1947); *Sherling v. Gallatin*

*Improvement Co.,* 237 A.D. 535, 261 N.Y.S. 747 (2d Dep't 1933). The mortgages specifically recite that they were "intended to secure any more debts now or in the future owed by the Mortgagor to the Mortgagee." The mortgages continued to serve to collateralize the debtors' obligations to the mortgagees under their extended corporate notes for which they remained personally liable to the mortgagees.

The extension agreements were recorded, as were the mortgages. If a new mortgage was required each time the original obligation was extended, it would follow that the mortgagees would have to pay additional mortgage taxes each time they recorded the new mortgage. When mortgages are paid down and new loans are subsequently extended to the amount of the original mortgage, a new mortgage is not required and an additional recording tax is not paid. Until satisfied, the originally recorded mortgage serves as security for the mortgagor's debt. Moreover, if a new mortgage had to be recorded as a separate transaction each time a mortgage loan is extended, it would follow that an intervening recorded mortgage would have priority over the mortgagee of the extended loan who recorded the new mortgage after the docketing of the intervening mortgage. This suggested procedure would undermine the security afforded recorded mortgagees. Hence, the arguments of the trustee and the fourth mortgagees as to the need for the issuance of a new mortgage each time the mortgagor's original obligation is extended are without merit.

### 2. *Administration Expenses*

■ The trustee in bankruptcy seeks to recover from the proceeds of the trustee's sale of the secured real estate his costs and expenses with respect to the disposition of the property, to the extent permitted under 11 U.S.C. § 506(c), which reads:

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

The trustee maintains that his services in preserving and disposing of the secured real estate were performed for the benefit of the second and third mortgagees and they should bear a proportionate share of the administration expenses. The proceeds derived from the sale of the secured real estate were sufficient to pay the first, second and third mortgages in full. Thus, had these mortgagees foreclosed on their mortgages, they would have received full satisfaction without the intervention of the trustee. There is no evidence that these over-secured mortgagees requested the trustee to administer their collateral or consented to such administration. They simply did not object to his application to sell the real estate free and clear of their liens, which were to attach to the proceeds. These facts do not give rise to an implied consent by the mortgagees to bear a proportionate part of the administration expenses.

Implied consent, as distinguished from actual consent, generally is limited to cases where the creditor has in some way caused the additional expense.

*General Electric Credit Corporation v. Peltz (In re Flagstaff Food Service Corp.),* 762 F.2d 10, 12 (2d Cir.1985). *See also General Electric Credit Corporation v. Levin & Weintraub (In re Flagstaff Food Service Corp.),* 739 F.2d 73, 76–77 (2d Cir. 1984).

The mortgagees, who were admittedly over-secured, would have recovered the full amounts due them from the bankrupts in state court and there is no reason why they should receive less in this court merely because all of the parties permitted the trustee to liquidate the estate.

*In re Creed Bros., Inc.,* 70 B.R. 583 at 587 (Bankr.S.D.N.Y.1987).

■ This is not a case where the mortgagees took positive steps to enhance or protect their secured position, such as requesting the appointment of a trustee, as in *In re Hotel Associates, Inc.,* 6 B.R. 108 (Bankr.E.D.Pa.1980). Nor is this a case where a mortgagee is asked to defray specific overhead expenses attributable to the

sale of the secured assets at a higher price, as in *In re Jim Kelly Ford of Dundee, Ltd.*, 14 B.R. 812 (N.D.Ill.1980), or the actual costs of foreclosure and litigation to quiet title on real property, as in *In re Truitt*, 15 B.R. 169 (Bankr.N.D.Ga.1981). In this case the trustee seeks to impose a proportionate share of the administration expenses on the second and third mortgagees because they did not object to his sale of the encumbered real estate. Obviously, under these circumstances, the first mortgagee had a more immediate interest in the sale. The second and third mortgagees were not primary beneficiaries of the negotiated sale. The indirect benefits that the second and third mortgagees derived from the trustee's sale are too remote to support their being saddled with a portion of the administration expenses. *In re Roamer Linen Supply, Inc.*, 30 B.R. 932, 936–937 (Bankr.S.D.N.Y.1983); *In re Codesco*, 18 B.R. 225, 229–230 (Bankr.S.D.N.Y.1982).

### 3. *Attorneys' Fees*

Edward R. Miller, as attorney for J.A.M., seeks reimbursement for legal services and disbursements authorized under the BFM note and under the J.A.M. mortgage. He requests $11,650.00 for legal fees, together with $2,235.00 for costs and disbursements, including collection fees paid to Stanford Joseph, Esq. In light of the legal services performed, this court finds that the sum of $8,650.00 represents a reasonable allowance for Mr. Miller's services. Additionally, he should be fully reimbursed for his costs and disbursements of $2,235.00, for a total allowance of $10,885.00.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A).

2. The mortgagees, J.A.M. and Putnam, have established that they are entitled to claim a security interest in the proceeds arising out of the trustee's sale of real estate which the debtors mortgaged to J.A.M. and Putnam as security for the debtors' personal guarantees of the loans which J.A.M. and Putnam made to BFM.

3. The mortgagees, J.A.M. and Putnam have also established that their secured claims include interest at the rates expressed in the corporate notes which BFM issued to J.A.M. and Putnam.

4. The trustee in bankruptcy and the fourth mortgagees have not sustained their burden of proving that the legal fees and mortgage broker's fees should be treated as inuring to the benefit of the mortgagees as additional charges. Therefore, the claims of criminal usury that were asserted by the trustee and the fourth mortgagees were not established.

5. The trustee has failed to establish that the second and third mortgagees, J.A.M. and Putnam, should be responsible for a portion of the administration expenses of these estates pursuant to 11 U.S.C. § 506(c).

6. Edward P. Miller, Esq., as attorney for J.A.M., is entitled to reasonable legal fees and reimbursement for costs and expenses in the total sum of $10,885.00.

SETTLE ORDER on notice in accordance with the foregoing.