**In re CODESCO INC., Debtor.**

**Bankruptcy No. 80 B 20283.**

United States Bankruptcy Court,
S. D. New York.

March 8, 1982.

Eisen & Fishman, New York City, for debtor.

Wexler, Weisman, Forman & Shapiro, P. C., Philadelphia, Pa., for I. U. North America, Inc.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Oftentimes the measure of success that distinguishes experienced bankruptcy counsel from attorneys who perform nonbankruptcy-related services for a debtor is their obtaining a fee while funds are available. In this case the debtor's experienced bankruptcy counsel, Levin & Weintraub, successfully applied for an interim allowance, as permitted under Code § 331, before the Chapter 11 case under the Bankruptcy Code was converted for liquidation purposes to Chapter 7. However, Eisen & Fishman (now Fishman Forman & Landau), who were the debtor's prepetition attorneys and who were retained as co-counsel for the debtor to perform corporate legal services and contract negotiations apart from administering the ongoing Chapter 11 case, failed to obtain court consideration of their interim fee application because their supporting papers were insufficient to sustain any allowance. Unfortunately the case was converted to Chapter 7 before they could resubmit a proper fee application. Substantially all of the debtor's assets are claimed by I.U. North America, Inc. (hereinafter called "I.U.") pursuant to an asserted perfected security interest. Therefore, Eisen & Fishman seek to salvage their claim for legal services by holding I.U. responsible for their fee on the theory that their services were required for the preservation and disposition of the estate through liquidation sales of the debtor's assets and that such services benefitted I.U. and should be recovered from property securing I.U.'s claim, as authorized under Code § 506(c).

I.U. vigorously opposes this application on the ground that I.U. did not consent to the administration of their secured property by these attorneys and that the legal services were not incurred for the preservation, protection or benefit of the secured property. Additionally, I.U. asserts that the services rendered by the debtor's co-counsel took place during the Chapter 11 proceeding and may not be treated as Chapter 7 administrative expenses entitled to a super-priority under Code § 726(b).

The United States Trustee takes no position concerning the issue as to whether or not these fees are compensable under Code § 506(c). However, the United States

Trustee notes that there appears to be unnecessary duplication of effort between the applicants and the debtor's other co-counsel, Levin & Weintraub. Moreover, it appears that the applicants held funds of the estate, totalling approximately $1,400,000, in a non-interest bearing escrow account for a significant period of time, notwithstanding that Code § 345(a) requires that funds of an estate should be deposited or invested in a manner "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." Moreover, the United States Trustee observes that the record indicates that the requisite financing statements in connection with the sale of the debtor's facilities in California to Dentalloy, Inc. were not properly and timely filed with the appropriate recording office in California. Since Dentalloy thereafter became a debtor in a case under Chapter 11, which was commenced on November 19, 1981, the status of this debtor as a creditor of Dentalloy appears to be impaired because the applicants' failure to comply with the filing requirements under the Uniform Commercial Code resulted in causing the debtor's otherwise secured claim against Dentalloy to be deemed unsecured to the detriment of the estate and its creditors.

## COMPENSATION FROM THE ESTATE

Code § 330 authorizes the payment of reasonable compensation to the debtor's attorney for actual, necessary services rendered by such attorney based on the time, the nature, the extent and the value of the services rendered. Such compensation and reimbursement is expressly allowable from the debtor's estate as an administrative expense pursuant to Code § 503(b)(2) and is accorded a first priority status under Code § 507(a)(1). In the event there are insufficient funds in the estate to pay the holders of a particular priority class in full, Code § 726(b) requires that all claims within that class should be paid on a pro rata basis.

The debtor's co-counsel in this case face a greater obstacle to their claim for compensation than mere insufficiency of funds in the Chapter 11 estate. All of their legal services were rendered while the debtor operated under the provisions of Chapter 11 and before the case was converted for liquidation under Chapter 7. Code § 726(b) specifies that the so-called "burial expenses" incurred in the administration of a superseding Chapter 7 case are to have super-priority status and must be paid ahead of the administrative expenses attributable to the Chapter 11 case before it was converted. If this hurdle were not enough, the applicants are confronted by an additional impediment because it appears that I.U.'s secured claim is under-collateralized and that there may not even be any funds available to satisfy the super-priority administrative expenses of the Chapter 7 case.

The applicants argue that the super-priority status under Code § 726(b) does not preclude payment to them because all liquidation expenses are entitled to protection under this section and that is precisely what they claim; compensation for legal services performed in the course of liquidating the debtor's assets under Chapter 11. Thus, they maintain that it matters not that the liquidation services were rendered during the Chapter 11 case, because such services, whenever performed, should be entitled to super-priority status. The weakness in this position stems from the fact that the applicants have read into Code § 726(b) the word "liquidation", whereas this section clearly states that when a case is converted to Chapter 7 "the administrative expenses incurred under this chapter [Chapter 7] after such conversion have priority over administrative expenses incurred under any other chapter . . .". The super-priority status for the so-called "burial expenses" after the conversion was intended to provide an incentive to encourage capable trustees and professionals to act in superseding cases. This purpose would be negated if liquidating administrative expenses of an aborted Chapter 11 case could also qualify for super-priority status in a converted Chapter 7 case. The applicants' position must be rejected because Code § 726(b) does not describe the super-priori-

ty expenses in terms of "liquidating", nor does this section allow for the inclusion of any administrative expenses of an aborted Chapter 11 case, liquidating or otherwise. Code § 726(b) expressly limits the super-priority status to those administrative expenses incurred solely under the Chapter 7 case after its conversion. Hence, the applicants are compelled to look beyond this estate for the source of any compensation with respect to their legal services performed during the Chapter 11 period.

## COMPENSATION UNDER CODE § 506(c)

Understandably, the applicants also focus upon the funds held by the Chapter 7 trustee in bankruptcy who was elected by the unsecured creditors pursuant to Code § 702. These funds, consisting mainly of receipts from accounts receivable and the liquidation of the various facilities owned by the debtor throughout the country, are claimed by I.U. under its security interest. Hence, the applicants contend that I.U. benefitted from their legal services during the Chapter 11 period in the preservation and disposition of assets covered by I.U.'s lien, and therefore, I.U. should be charged for the reasonable value of such benefit.

The controlling statutory provision is Code § 506(c), which provides:

"§ 506.  Determination of secured status.

.      .      .      .      .

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

The services for which the applicants seek compensation in the sum of $101,563, less the sum of $25,000 previously paid, leaving a balance of $76,563, plus expenses of $7,308.52 are summarized as:

"a.   negotiations for disposition of Codesco's assets.

b.   preparation of contracts of sale for disposition of Codesco's assets.

c.   closing of contracts of sale for disposition of Codesco's assets.

d.   day-to-day handling of vast array of problems, including litigation, insurance, financing, employee concerns, and related matters.

e.   preparation for and attendance at Court hearings respecting the sale of Codesco's assets.

f.   serving as escrow agent for the lion's share of the proceeds of the sale of Codesco's assets."

The applicants assert that the sale of the debtor's assets through negotiation as a going business rather than through a forced liquidation sale greatly enhanced and benefitted the estate and in turn the secured creditor, I.U.   Under the former Bankruptcy Act a secured creditor could not be saddled with all of the expenses incurred in connection with the general administration of the estate;  these had to be borne by the estate.   See *Gugel v. New Orleans Nat. Bank*, 239 F. 676 (5th Cir. 1917);  *In re Hansen & Birch*, 292 F. 898 (D.C.N.D.Ga. 1923);  *Lerner Stores Corporation v. Electric Maid Bake Shops*, 24 F.2d 780 (5th Cir. 1928).   However, a secured creditor could be compelled to contribute to "the reasonable cost of selling the encumbered property, usually to be measured by the *actual cost* in a state court of foreclosing the lien." (Emphasis added)  *Maxcy v. Walker*, 119 F.2d 535 at 536 (5th Cir. 1941).   Where there was no actual foreclosure, hypothetical attorneys' fees could not be allowed.  *Maxcy v. Walker*, supra.

■    The legislative history reflects that Code § 506(c) codifies current law and that recovery, if any, is limited to the extent of any benefit to the holder of the secured claim.  *House Report No. 95–595, 95th Cong.*, 1st Sess. (1977) 357;  *Senate Report No. 95–989*, 95th Cong., 2d Sess. (1978) 68, U.S.Code Cong. & Admin.News 1978, p. 5787.   Where the proceeds from a trustee's sale of encumbered property are sufficient to cover the actual costs associated with the sale and to pay the secured claim in full, it has been held that Code § 506(c) does not authorize charging the encumbered assets with foreclosure costs

because the lienholder received no benefit and would have realized full satisfaction of its claim without the intervention of the trustee. *In re Robertson*, 14 B.R. 706 (Bkrtcy.N.D.Ga.1981). The key factor is whether or not any "benefit" was received by the holder of the secured property, since any recovery permitted from such property must be measured not by the outlay, but by the necessity and the benefit involved, usually limited to the actual foreclosure costs saved by the lienholder where the full satisfaction would not otherwise have been realized because the secured claim exceeded the value of the encumbered property. See *In re Truitt*, 15 B.R. 169 (Bkrtcy.N.D.Ga.1981). Thus, where a secured claimholder sought the appointment of a trustee under Code § 1104 and received the benefit of the trustee's administrative functions, such creditor may be charged with the administrative expenses incurred as a result of such appointment. *In re Hotel Associates, Inc.*, 6 B.R. 108 (Bkrtcy.E.D.Pa.1980).

In this case, the debtor originally acquired all of its assets and its business from I.U. pursuant to a purchase money security interest for approximately $18,000,000. Citicorp financed the acquisition by advancing in excess of $20,000,000. The Citicorp lien was secured by a first lien on all of the debtor's accounts receivable and a second lien on its inventories. Under the purchase money mortgage I.U. received a first lien on the debtor's inventories and a second lien on all accounts receivable. Prior to the filing of the Chapter 11 petition, the debtor's obligation to I.U. amounted to approximately $13,000,000 whereas about $7,000,000 was due to Citicorp. The Chapter 11 proceeding was financed by advances from Citicorp up to $1,500,000, which were approved by the court and given a first priority administrative expense status in the Chapter 11 case. The debtor's petition for reorganization under Chapter 11 was filed on June 27, 1980. The applicants state that the debtor hoped to effect a reorganization by liquidating its laboratory operations, which were extremely labor intensive and carried high payrolls. The debtor also expected to reduce operating expenses and maximize available financing by liquidating many of its supply distribution outlets. Moreover, the applicants state that through the end of August, 1980, the debtor believed that if it disposed of all its satellite divisions and laboratories and retained its facilities located in Albuquerque, Phoenix and El Paso, it would be strong enough to propose a plan of reorganization to unsecured creditors. By the beginning of September, 1980, the debtor determined that it would be impossible to revitalize its business. Thereafter, all of the efforts of the debtor and the applicants were focused on liquidating the company's assets. However, as a result of the debtor's efforts and the performance of legal services by the applicants through September, 1980, when reorganization through revitalization was the objective rather than liquidation, most of the debtor's laboratories and distribution centers had already been sold.

In the course of the applicant's efforts during the so-called reorganization phase in this case, the secured indebtedness to Citicorp, which amounted to approximately $7,000,000 at the time of the filing of the petition, was satisfied. The benefit bestowed upon Citicorp is of little comfort to I.U., whose secured claim is apparently under-collateralized by over $3,666,000. Moreover, the Chapter 11 creditors' committee challenges I.U.'s secured claim for various reasons including equitable subordination under Code § 510(c). If the creditors' committee, and now the Chapter 7 trustee, succeed in defeating or subordinating I.U.'s secured claim, there will be an additional reason for finding a lack of any property securing an allowed secured claim which can be characterized as having benefitted from any preservation or disposition expenses within the meaning of Code § 506(c). Nevertheless, the reorganization legal services performed by the applicants were primarily of benefit to the debtor and indirectly of some benefit to Citicorp. Any tertiary benefit bestowed upon the secured property claimed by I.U. as a result of such activities is too indefinite and remote to support an allowance to the extent of the

hypothetical foreclosure expenses that I.U. supposedly saved. Code § 506(c) was not intended as a substitute for the recovery of administrative expenses that are appropriately the responsibility of the debtor's estate.

## RECOVERY

 The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs. "[T]he debtor's only interest in such security is to the surplus remaining after payment of the debt. The security, in so far as necessary to pay the debt, has been carved out of the debtor's estate before bankruptcy occurs." *In re Tele-Tone Radio Corp.*, 133 F.Supp. 739, 750 (D.C.N.J.1955). As was stated in *Textile Banking Company v. Widener*, 265 F.2d 446 at 454 (4th Cir. 1959):

"We believe the correct rule to be that the security can be charged with the expense *actually* incurred by the Trustee in making the sale; with the proviso, however, that this cost must not exceed what it would cost the creditor to proceed in the State court."

In this case, the debtor-in-possession did not pay the legal fees in connection with the liquidation sales which are the object of the applicants' claim for compensation. Moreover, it appears unlikely that the debtor's estate and its unsecured creditors will ever be charged with such fees because I.U.'s secured claim exceeds the value of the funds on hand. Accordingly, the applicants have no basis for the recovery of costs which were not expended by the estate; one cannot recover what was not lost.

## PARTY IN INTEREST

There is another critical flaw in the application submitted by the debtor's non-bankruptcy co-counsel which was not addressed by the parties. Code § 506(c) says: "The trustee may recover . . .". The applicants are neither the trustee nor the debtor-in-possession; they are attorneys retained by the debtor-in-possession. In this case neither the erstwhile Chapter 11 debtor-in-possession nor the current Chapter 7 trustee seek a recovery under Code § 506(c) from the secured property, since, as previously indicated, no costs were paid for which recovery could be claimed. The applicants as co-counsel for the debtor are not the proper parties to charge the secured property for their fee in preserving or disposing of the property to the extent that such conduct allegedly benefitted the lienholder. There is nothing in Code § 506(c) that creates an independent cause of action in favor of the debtor's attorneys against the holders of secured claims or their collateral. Implicit in the basis for recovery is that the costs were paid by the estate and that the debtor-in-possession or the trustee, acting for the estate, is the proper party to seek a recovery under Code § 506(c).

Applications for attorneys' fees must be made by them pursuant to the standards delineated under Code § 330. Counsel may not use Code § 506(c) as an alternative in order to avoid the requirements imposed under Code § 330. Therefore, the application in question is misdirected, impermissible and is dismissed.

IT IS SO ORDERED.