**In re CROTON RIVER CLUB, INC., Debtor.**

**Bankruptcy No. 91 B 20215 (HS).**

United States Bankruptcy Court, S.D. New York.

Dec. 8, 1993.

Pryor, Cashman, Sherman & Flynn, New York City, for FDIC.

Office of the United States Trustee, S.D.N.Y., New York City.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for debtor.

*DECISION ON OBJECTION OF THE FEDERAL DEPOSIT INSURANCE CORPORATION AND THE UNITED STATES TRUSTEE TO THE APPLICATION FOR FINAL COMPENSATION OF KAY, SCHOLER, FIERMAN, HAYS & HANDLER*

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Croton River Club, Inc. (the "debtor") filed a voluntary petition for reorganization under Chapter 11, 11 U.S.C. §§ 1101 *et seq.*, with this Court on February 14, 1991 (the "petition date"). The debtor continued managing its business as debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108. On the petition date, this Court approved an order retaining the law firm of Kaye, Scholer, Fierman, Hays & Handler ("Kaye, Scholer") as counsel for the debtor and debtor in possession pursuant to 11 U.S.C. § 327.

On October 21, 1993, Kaye, Scholer moved this Court for approval of final compensation for professional services rendered and reimbursement of expenses incurred from the petition date through and including September 30, 1993 in the approximate aggregate amount of $506,258. The Federal Deposit Insurance Corporation ("FDIC") and the Office of the United States Trustee ("U.S. Trustee") filed objections to Kaye, Scholer's final fee application.

### FACTUAL BACKGROUND

The debtor is a New York corporation that, as of the petition date, owned a mixed-use real estate development known as "Half Moon Bay" located on the Hudson River in Croton-on-Hudson, Westchester County, New York. The debtor's real estate consisted of a parcel of land dedicated to the development of residential units ("Upland Parcel"), an adjoining boat marina ("Marina"), and land dedicated to the construction of a waterfront restaurant ("Restaurant Parcel"). The FDIC, as successor in interest to Eliot Bank, has a claim against the debtor for prepetition loans in the amount of $6.8 million which is secured by a first and second mortgage lien extending only to the Marina and the Restaurant Parcel.

To date, Kaye, Scholer has received two interim fee awards by order of this Court for the periods February 14, 1991 though August 31, 1991 and September 1, 1991 through July 31, 1992. These interim awards amounted to a total of $263,455 for fees, exclusive of a $27,162 holdback, and $30,461 for expenses. Of the approximate $293,916 already paid to Kaye, Scholer, $250,000 was actually paid by a carveout of a post-petition superpriority financing agreement solely related to the Upland Parcel. The approximate $43,916 remaining was paid from a tax refund which, again, related solely to the Upland Parcel.

Thus, none of the prior interim payments came from the FDIC's cash collateral (revenues from the Marina). This is significant since, during the timeframe relating to the interim payments, Kaye, Scholer successfully negotiated a stipulation with the FDIC for the use of the FDIC's cash collateral in order to continue the Marina's operations and enhance and/or preserve the ultimate sales value of the Marina.

During the third interim period, Kaye, Scholer represented the debtor in its efforts to dispose of the Marina and Restaurant Parcel for the benefit of, among others, the FDIC. In addition to negotiations with potential purchasers of the properties, Kaye, Scholer represented the debtor in trial and appellate litigation concerning the Marina's allocation of the overall Half Moon Bay 1992 operating expenses ("Allocation Litigation"). *See e.g., Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc. (In re Croton . River Club, Inc.)*, 145 B.R. 185 (Bankr.S.D.N.Y.1992), *aff'd*, 162 B.R. 648 (S.D.N.Y.1993). This litigation resulted in the Marina's allocation of the overall Half Moon Bay expenses being permanently reduced from 53% to 14.25%, or an annual approximate savings, based on 1992 expenses, of $140,000. Finally, during this period, Kaye, Scholer provided day-to-day services relating to the operation of the Marina such as negotiating new boat slip leases, responding to informational requests of the FDIC, and reviewing and filing Marina operating reports with this Court.

On May 12, 1993, the Chapter 11 case was converted to a Chapter 7 liquidation with a Chapter 7 trustee being appointed on May 14, 1993 and a new attorney being retained by the trustee on June 4, 1993. Following the conversion, the Marina and Restaurant Parcel were successfully sold by auction for $715,000. Now, Kaye, Scholer moves this Court for final payment of attorneys' fees pursuant to 11 U.S.C. §§ 506(c) and 726(b) with such payment coming first from the approximate $31,000 of available unencumbered funds in the debtor's estate and with the remaining deficiency of $181,342 being recovered from the monies received by the debtor following the auction sale of the FDIC's collateral.

## DISCUSSION

A. Recovery of Attorneys' Fees under 11 U.S.C. § 506(c)

■ Generally, the normal administrative expenses of the bankruptcy estate may not be recovered from secured claim holders because the trustee acts not for their benefit but for the benefit of the estate and its unsecured claimants. *General Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.),* 739 F.2d 73, 76 (2d Cir. 1984) (hereinafter *Flagstaff I* ); *In re Trim–X, Inc.,* 695 F.2d 296, 301 (7th Cir.1982); *In re Codesco, Inc.,* 18 B.R. 225, 228 (Bankr. S.D.N.Y.1982). Section 506(c), however, is the exception to the general rule, applicable when expenses of preservation are incurred primarily for the benefit of the secured interest or where the secured claim holder caused or consented to the accrual of such expenses. *Flagstaff I,* 739 F.2d at 76; *In re Trim–X, Inc.,* 695 F.2d at 301; *In re Codesco, Inc.,* 18 B.R. at 228.

■ Section 506(c) provides that the "trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). Attorneys' fees may properly be recovered under § 506(c) to the extent of the benefit provided so long as: (i) the services were necessary in order to pre-serve or dispose of the secured creditor's property; (ii) the amounts charged for such services were reasonable; and (iii) the expenses were incurred for the primary benefit of the secured creditor. *General Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.),* 762 F.2d 10, 12 (2d Cir.1985) (hereinafter *Flagstaff II* ); *Flagstaff I,* 739 F.2d at 75–76; *In re Codesco, Inc.,* 18 B.R. at 229.

■ The burden to prove entitlement to fees under § 506(c) rests with the movant, *Flagstaff II,* 762 F.2d at 12, and the burden is a heavy one, *In re Emons Indus.,* 50 B.R. 692, 695 (Bankr.S.D.N.Y.1985). Thus, it must be determined whether Kaye, Scholer has merits burden in the instant case.

■ As of the petition date, the secured creditor, the FDIC, had a claim for $6.8 million which was secured by the value of the Restaurant Parcel and Marina. It is the position of both the FDIC and the U.S. Trustee that Kaye, Scholer has failed to show that it conferred a benefit upon the FDIC and therefore its request for attorneys' fees pursuant to § 506(c) must be denied. Such a contention is not supported by the record.

Kaye, Scholer's representation of the debtor in its Chapter 11 reorganization caused actual benefits to be conferred upon the FDIC as a secured creditor and resulted in the accrual of legal fees and expenses which were incurred for the primary benefit of the FDIC. Kaye, Scholer points to the following significant achievements as benefitting the FDIC by increasing the value of the FDIC's collateral: (i) the negotiation of a stipulation for the use of the FDIC's cash collateral resulting in the enhancement and preservation of the Marina's ultimate sales value; and (ii) the representation of the debtor in the Allocation Litigation resulting in an increase in the Marina's sales value due to the reallocation and reduction of the Marina's portion of the overall Half Moon Bay annual operating expenses from 53% to 14.25%.

Kaye, Scholer's negotiation of the cash collateral stipulation with the FDIC resulted in the maintenance of the Marina as a going concern. The FDIC's only possible rationale for consenting to such an arrangement would be its belief that the Marina would be more

valuable as a going concern than as a nonperforming asset. As the Court of Appeals for the Eighth Circuit has written, "the ambition of [a] creditor to preserve and improve its secured collateral and the opportunity to realize that ambition" is indeed a "benefit" which will support the award of § 506(c) expenses. *United States v. Boatmen's First Natl. Bank*, 5 F.3d 1157, 1159 (8th Cir.1993); *see also Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Co.)*, 799 F.2d 91, 94 (3rd Cir.1986) (" 'The definition of benefit encompasses more than the bottom line of a balance sheet. Preservation of the going concern value of a business can constitute a benefit to the secured creditor.' " (quoting *In re Afco Enters.*, 35 B.R. 512, 515 (Bankr.D.Utah 1983))).

Further, by consenting to the cash collateral stipulation, the FDIC impliedly consented to the payment of legal fees associated with the order. Although a secured creditor's consent to bearing the cost of professional services of the debtor is neither to be lightly inferred nor inferred merely due to the secured creditor's cooperation with the debtor's bankruptcy case, *Flagstaff I*, 739 F.2d at 77, in the instant case, such an inference is appropriate.

In *Flagstaff I*, it was held that a secured creditor who had obtained a superpriority interest in all the debtor's property, in exchange for entering into a cash collateral financing agreement, did not consent to paying for the professional services related to the financing agreement. *Flagstaff I*, 739 F.2d at 77. The case before this Court, however, is distinguishable from *Flagstaff I* since the cash collateral stipulation at issue here granted no superpriority interest to the secured creditor, the FDIC. This distinction is significant due to the fact that the *Flagstaff I* court's decision on the consent issue was expressly based upon the existence of the super-priority interest. The court wrote:

> [T]he existence of consent is negatived by the [super-priority] provisions of the Financing Order.... The Financing Order granting [the creditor] a super-priority position was intended to give [the creditor] protection against the very awards made herein. The lack of sufficient unencumbered assets to pay [attorneys'] fees is not an adequate basis for denying [the creditor] its super-priority status.

*Flagstaff I*, 739 F.2d at 77. Consequently, it is the holding of this Court that when a secured creditor, in order to preserve the going concern value of its collateral, consents to a cash collateral stipulation without obtaining a superpriority interest, the legal expenses associated with such an order are recoverable from the value of the secured collateral pursuant to § 506(c).

Next, the Court will address the issue of whether Kaye, Scholer conferred a benefit upon the FDIC as a primary result of their representation of the debtor in the Allocation Litigation. Before the Allocation Litigation, the Marina and Restaurant Parcel were responsible for paying an allocation set by the homeowners-in-residence who resided on the Upland Parcel. Although the Marina's historic allocation was 14.25% of the common charges, in December of 1991, the homeowners set the Marina's allocation at 53% for the 1992 season. According to the affidavit of the debtor's vice-president, Susan Hanna, during the 1991–92 season the debtor anticipated annual revenues of $278,000 with expenses of $158,000 prior to the payment of debt service, real estate taxes, and the allocated portion of the common charges. Therefore, if the debtor was to pay the allocated 53% of common charges for the 1992 season, or $160,324, it would have had a negative cash flow of more than $40,000 prior to the payment of taxes and debt service.

Such a situation manifestly chilled any bona fide bidding for the Marina by potential purchasers. Not only was this fact not contested by the FDIC, but indeed it was the FDIC's own position that "any material alteration in the marina budget allocation could destroy the value of the marina as a saleable asset," *In re Croton River Club, Inc.*, 162 B.R. 648, 650 n. 1 (S.D.N.Y.1993).

Further, the successful bidder for the Marina had conditioned his purchase upon the allocation set by this Court being approved in any resultant appeals taken on the issue. Clearly, the Marina was not saleable prior to the successful representation of the debtor

by Kaye, Scholer in the Allocation Litigation. Therefore, since prior to the Allocation Litigation the Marina could not be sold, its collateral value to the FDIC was zero. However, after the litigation, the Marina was sold for $715,000 and consequently the FDIC was benefitted by Kaye, Scholer's representation to the extent of $715,000. Thus, the FDIC was benefitted within the guidelines of *Flagstaff I* and therefore Kaye, Scholer is entitled to collect reasonable fees for the services rendered from the value of the FDIC's collateral.

Additionally, it should be noted that although consent is not to be inferred merely due to a secured creditor's cooperation with the debtor's bankruptcy case, *Flagstaff I*, 739 F.2d at 77, it is relevant that the FDIC never made any request to this Court for relief from the automatic stay pursuant to 11 U.S.C. § 362. The FDIC essentially sat back and, except for arguing that it should not be bound by the Allocation Litigation since it was not a party to the stipulation which originally gave the homeowners the right to set the Marina's allocation, allowed the debtor to proceed with the Allocation Litigation without objection. This fact supports Kaye, Scholer's contention that the FDIC consented to the debtor's pursuit of the Allocation Litigation with such view being further buttressed by the fact that the FDIC did not object to the debtor's retention of an expert witness to testify at the allocation trial with payment therefore being charged against the Marina pursuant to § 506(c).

Next the specific objections of the FDIC and the U.S. Trustee, exclusive of their claim that Kaye, Scholer conferred no benefit upon the FDIC, discussed *supra*, must be addressed.

### 1. The FDIC's Objections

█ The FDIC objects to the award of fees to Kaye, Scholer due to: (i) Kaye, Scholer's failure to seek a reduction in the amount of assessed real estate taxes on the Marina; (ii) Kaye, Scholer's creation of a "litigation climate" due to their handling of the allocation issue between the Marina and the homeowners; and (iii) Kaye, Scholer's tardy and infrequent filing of the debtor's operating reports.

These objections raise no basis for the denial of legal fees pursuant to the provisions of § 506(c) as discussed *supra*. Section 506(c) provides that fees and expenses incurred while preserving or disposing of property that secures an allowed claim may be recovered "to the extent of *any benefit*" conferred upon the secured creditor. 11 U.S.C. § 506(c) (emphasis added).

Thus, whether or not Kaye, Scholer contested assessed real estate taxes or not or whether Kaye, Scholer created a "litigation climate" is irrelevant since, firstly, Kaye, Scholer has requested no fee award for such activities, and secondly, a "benefit" was conferred upon the FDIC through other activities for which Kaye, Scholer seeks payment. Finally, the assertion that Kaye, Scholer failed to file operating reports is patently contradicted by the information found in the docket.

While the FDIC claims that only three entries appear on the docket reflecting the filing of operating reports, the docket clearly reflects no fewer than ten such entries. However, even if the FDIC was correct in its claim that Kaye, Scholer was delinquent in filing the debtor's operating reports, it is the responsibility of the debtor or debtor in possession, not the debtor's attorneys, to file such reports and consequently any failure on Kaye, Scholer's part in this regard is not a proper ground for denying payment of legal fees pursuant to § 506(c). 11 U.S.C. §§ 704, 1106, 1107.

### 2. The U.S. Trustee's Objections

The Court now addresses the objections raised by the Office of the United States Trustee. The U.S. Trustee raises the following issues as grounds for a denial of Kaye, Scholer's fee application: (i) Kaye, Scholer's request for fees is premature in that such fees are administrative expenses of the Chapter 11 and thus are only entitled to priority subordinate to Chapter 7 administrative expenses; (ii) Kaye, Scholer may not be paid since the extent to which any other administrative expenses remain unpaid that

accrued during the Chapter 11 proceeding is unknown and such expenses must be paid *pari passu* with Kaye, Scholer's fees; and (iii) Kaye, Scholer may not be reimbursed for word processing expenses sought in the amount of $9,307 because pursuant to Administrative Order, such expenses are not reimbursable unless they are excluded from the firm's overhead for the purpose of setting billing rates and Kaye, Scholer failed to address this matter.

■ The first two grounds raised by the U.S. Trustee for denial of Kaye, Scholer's fee award are not persuasive and thus will not preclude a recovery by Kaye, Scholer under § 506(c). The U.S. Trustee correctly states the proposition that the administrative expenses of an aborted Chapter 11 proceeding may be paid only following the payment of like expenses which were incurred during the subsequent Chapter 7 liquidation. 11 U.S.C. § 726(b); *see also Huisinga v. Carter (In re Juhl Enters., Inc.)*, 921 F.2d 800 (8th Cir. 1990).

■ Further, although the § 726(b) superpriority provision expressly subrogates § 503(b) expenses, the superpriority also potentially trumps § 506(c) since § 506(c) merely provides another basis for the satisfaction of a § 503(b) expense as opposed to providing an independent basis for the recovery of administrative expenses. *In re Codesco*, 18 B.R. 225, 230 (Bankr.S.D.N.Y.1982) ("Counsel may not use Code § 506(c) as an alternative in order to avoid the requirements imposed under Code § 330."). Such a reading of § 506(c) is further bolstered by the corollary that if a secured creditor gains no direct and primary benefit from the imposition of administrative expenses, then the trustee may not recover such funds from the secured creditor's collateral as a § 506(c) expense, but the claimant may share in a pro rata distribution of available estate funds with like claimants pursuant to § 503(b).

Kaye, Scholer's § 506(c) claim, therefore, is potentially subject to subrogation by § 726(b). For such subrogation to be effected, however, the superpriority Chapter 7 administrative expense must itself meet the requirements for § 506(c) application. If these requirements are met then the Chapter 7 § 506(c) expenses are paid first from the secured creditor's collateral, to the extent of the benefit provided thereby, with the collateral's remaining value then going to satisfy the Chapter 11 § 506(c) expenses. If the § 506(c) requirements are not met, however, then the § 726(b) expenses only supersede the § 503(b) general administrative expenses of the estate and do not subrogate the recovery of any administrative expenses eligible for § 506(c) status.

Although the U.S. Trustee makes no objection to the fixing of final compensation and expenses of Kaye, Scholer, the potential for the reduction and subordination of its claim clearly exists since other potential § 506(c) administrative fees were incurred during both the Chapter 7 and Chapter 11 proceedings, i.e., unpaid real estate taxes. Consequently, this Court orders that the final fee application of Kaye, Scholer be allowed and paid by the Chapter 7 trustee subject to possible future disgorgement should: (i) the estate not prove large enough to provide for full satisfaction of the Chapter 7 superpriority § 506(c) claimants; and (ii) Kaye, Scholer's fee exceed its pro rata share of the distribution to the Chapter 11 § 506(c) administrative expense claimants.

■ The last issue raised by the U.S. Trustee regards expense reimbursement sought by Kaye, Scholer for word processing. As this issue is deemed by this Court to be a legitimate concern that Kaye, Scholer has failed to address in its final fee application, this portion of the request is denied.

This Court is aware that an estate is unnecessarily burdened, and a law firm undeservedly benefitted, when it is charged hourly billing rates which indirectly include charges for overhead expenses and then the estate is billed separately for such overhead expenses as photocopying and word processing. Concerns such as these prompted the Southern District to issue an administrative order adopting guidelines for the payment of expenses of bankruptcy professionals employed within the District. *See* General Order M-104 (Bankr.S.D.N.Y. June 24, 1991). Guideline D(11) provides that word processing expenses are not to be reimbursed by an

estate unless a law firm first attests that such expenses were not included in the firm's overhead for the purpose of setting the firm's hourly billing rates. As Kaye, Scholer has not addressed this issue in its final fee application, its request is denied until such a representation is made to this Court.

Finally, the issue of standing, although not raised by any party, must be addressed. This Court has previously held that since § 506(c) expressly provides for recovery by the "trustee," an attorney who is neither the trustee nor the debtor in possession may not charge its fee against the secured party pursuant to that section. *In re Codesco,* 18 B.R. 225, 230 (Bankr.S.D.N.Y.1982). During the intervening eleven years since that decision, however, there has been much discussion as to whether § 506(c) should be given a literal interpretation or whether it should be read expansively in relation to the Code as a whole. *See e.g.,* 3 L. King, Collier on Bankruptcy ¶ 506.06, at 506–58 n. 7a (15th ed. 1993) (listing cases on both sides of the issue but concluding that § 506(c) should be read expansively); *North County Jeep & Renault,*

*Inc. v. General Elec. Capital Corp. (In re Palomar Truck Corp.),* 951 F.2d 229, 231 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992) (noting division in judicial interpretation but following expansive reading of § 506(c)) [1]; *In re Parque Forestal, Inc.,* 949 F.2d 504 (1st Cir. 1991) (following expansive view of standing under § 506(c)); *New Orleans Pub. Serv., Inc. v. First Fed. Sav. & Loan Ass'n (Matter of Delta Towers Ltd.),* 924 F.2d 74 (5th Cir. 1991) (§ 506(c) recovery not limited to trustees); *Equitable Gas Co. v. Equibank, N.A. (In re McKeesport Steel Castings Co.),* 799 F.2d 91, 93–94 (3rd Cir.1986) (noting issue and giving broad interpretation of § 506(c) when trustee has no incentive to act). *But see e.g., Central States v. Robbins (In re Interstate Motor Freight Sys. IMFS, Inc.),* 71 B.R. 741, 743–44 (Bankr.W.D.Mich.1987) (citing cases on both sides of issue but giving strict construction of § 506(c)).

After reviewing the relevant caselaw, this Court finds the logic of the cases applying an expansive construction to the

---

**1.** It should be noted that *Palomar*'s expansive reading of § 506(c) was expressly limited to the Chapter 11 context where the issue of § 726's policy of favoring parity of payment to all claimants in a class did not have to be considered. In raising this issue, the court clearly referenced the holding of *Central States v. Robbins (In re Interstate Motor Freight Sys. IMFS, Inc.),* 71 B.R. 741, 744 (Bankr.W.D.Mich.1987).

The *Interstate* court held that in a Chapter 7 case which had been converted from a Chapter 11 proceeding, the application of § 726(b) mandated the strict construction of § 506(c) that only the "trustee" could recover funds under that section of the Code. The *Interstate* court held that any other reading would result in the violation of § 726(b). The *Interstate* court illustrated the issue by way of a hypothetical:

A Chapter 11 debtor incurs a $5,000 unpaid expense for [employee activity incurred] solely for the benefit of a secured creditor. The debtor also incurs $10,000 in general unpaid administrative expenses which can not be attributed to the sole benefit of any secured creditor. The case then converts to Chapter 7. The trustee incurs $2,000 in Chapter 7 administrative expenses. The only asset of the estate is the § 506(c) claim against the secured creditor for $5,000. Under § 726(b), when the $5,000 is recovered by the trustee, the Chapter 7 administrative expenses should be paid first, pro rata if there are insufficient funds, and then any balance should be used to pay the

Chapter 11 expenses, pro rata, again, if the funds are insufficient. Given this example ... the Chapter 7 expenses of $2,000 would be paid in full, and the Chapter 11 expenses would be paid pro rata, $1,000 to the [employees] and $2,000 to be paid pro rata to the other administrative claimants. However, if the [employees] could proceed on [their] own under § 506(c) [they] could recover [their] full claim of $5,000 and the other claimants would be left without any recovery at all. To permit such a result is to violate the distribution scheme created under § 726(b).

*Interstate,* 71 B.R. at 744–45.

While this hypothetical is indeed illustrative, it merely illustrates the *Interstate* court's preference to adhere to the strictures of § 726(b) over those of the general rule binding upon this Court enunciated by the Second Circuit in *Flagstaff I* that general administrative expenses are not to be paid from a secured creditor's collateral. *Flagstaff I,* 739 F.2d at 76. Such a result is exactly what the *Interstate* court endorses when it writes that the debtor's general administrative expense claimants are to be paid from the § 506(c) recovery engendered by the activity of the employees in its hypothetical. Therefore, while claiming to find bedrock upon which it could anchor a definitive construction of § 506(c), the *Interstate* court merely preferred one mandate of the Code over another and thus, this Court does not find *Interstate*'s reasoning persuasive and does not follow its conclusion.

standing issue of § 506(c) to be more persuasive than those applying a restrictive reading. This Court adopts the reasoning as enunciated by Collier's treatise to wit:

> [A] secured creditor who received a direct benefit from the rendition of services or provision of goods by an administrative claimant of the estate should have the collateral charged for such benefit, regardless of whether the proceeds of such charge are paid to the debtor, debtor in possession or trustee as reimbursement for its prior payment to the claimant or are paid to the claimant directly. Otherwise, if the debtor, debtor in possession or trustee does not have available funds to pay the claimant, the debtor, debtor in possession or trustee has no economic incentive to seek a recovery under 11 U.S.C. § 506(c) of amounts which will be paid over to the claimant and, as a result, the secured creditor obtains a windfall at the expense of the unpaid claimant.

Collier on Bankruptcy ¶ 506.06, at 506–58 n. 7a; *accord, In re Palomar Truck Corp.,* 951 F.2d at 232; *In re McKeesport Steel Castings Co.,* 799 F.2d at 94.

The logic of the foregoing analysis is further supported when, as in the present case, the trustee supports the attorney's request for fees and essentially allows the attorney to stand in the shoes of the trustee. To require that the trustee be the party who nominally requests § 506(c) payment, and to withhold recovery to a § 506(c) claimant on that basis, seems to be a distinction without a difference.

Due to the foregoing resolution of the dispute over Kaye, Scholer's final fee application pursuant to 11 U.S.C. § 506(c), Kaye, Scholer's right to such fee pursuant to 11 U.S.C. § 726(b) need not be addressed by this Court.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding in accordance with 28 U.S.C. §§ 157(b)(2)(B) and 157(b)(2)(K).

2. Kaye, Scholer has sustained its claim for attorneys' fees pursuant to 11 U.S.C. §§ 330(a), 503(b), and 506(c). Consequently, Kaye, Scholer's motion for fees is granted.

3. Kaye, Scholer has sustained its claim for expenses pursuant to 11 U.S.C. §§ 330(a), 503(b), and 506(c) excluding expenses for word processing in the amount of $9,307. Consequently, Kaye, Scholer's motion for expenses is granted excluding the word processing expense.

SETTLE ORDER IN ACCORDANCE WITH THE FOREGOING.