**In re IBI SECURITY SERVICE, INC., Debtor.**

**IBI SECURITY SERVICE, INC., Plaintiff,**

v.

**NATIONAL WESTMINSTER BANK USA,** National Westminster Bank, N.J., First Fidelity Bank, N.A., New Jersey, Revere Armored, Inc., and Nigel James Somerville Bowie, An Underwriter at Lloyd's, London, Other Lloyd's Underwriters Subscribing to Insurance Policy No. 576/ G371634, **Defendants.**

No. CV 94–4667(ADS).
Bankruptcy No. 91–71235–21.
Adversary No. 092–7042–21.

United States District Court,
E.D. New York.

March 3, 1997.

Goldman, Horowitz & Cherno, Garden City, NY (Andrew M. Thaler, of counsel), for Chapter 7 Trustee.

Mangone & Schnapp, New York City (Louis A. Mangone, of counsel), Special Counsel to Chapter 7 Trustee.

Kelley, Drye & Warren, New York City (Gary S. Jacobson, of counsel), for Creditor BII, Inc.

SPATT, District Judge:

BII, Inc. ("BII"), a secured creditor in the above-captioned bankruptcy case, appeals from two final orders of the bankruptcy court, Judge Melanie J. Cyganowski, which respectively (1) approve a settlement reached in the above-captioned adversary proceeding, and (2) authorize the distribution of certain settlement proceeds to the Chapter 7 Trustee. BII essentially contends that the bankruptcy court erred in approving the settlement and authorizing distribution of certain proceeds from the settlement to the Trustee, because the settlement and distribution to the Trustee allegedly violate the terms of a prior settlement between the Trustee and BII that was approved by the bankruptcy court.

### *Background*

The events underlying the instant bankruptcy case, and the various pleadings filed with respect to the adversary proceeding that is the subject of the settlement at issue in this appeal, have been previously described by this court in *IBI Security Service, Inc. v. National Westminster Bank USA (In re IBI Security Service, Inc.)*, 174 B.R. 664 (E.D.N.Y.1994), familiarity with which is presumed. Those events and pleadings will not be repeated here, except where necessary to supplement the recitation of events and facts peculiar to the present controversy.

### 1. The settlement agreement between BII and the Trustee

The debtor, IBI Security Service, Inc. ("IBI" or "debtor"), filed a voluntary Chapter 11 bankruptcy petition on June 4, 1991. The bankruptcy was converted to a Chapter 7 case on February 1, 1993, and Andrew M. Thaler ("Thaler") was appointed Trustee.

At the time of the conversion, the debtor was litigating an adversary proceeding against National Westminster Bank, USA, National Westminster Bank, N.J. (collectively "Natwest"), First Fidelity Bank, N.A., ("First Fidelity") (collectively with Natwest referred to as the "Banks"), New Jersey Revered Armored, Inc. ("Revere"), and an underwriter at Lloyd's of London ("Lloyd's") named Nigel James Somerville Bowie ("Bowie") (the adversary being referred to as the "Natwest Litigation"). The Natwest Litigation involved a myriad of claims arising from an alleged $2.9 million shortage of Natwest's money stored at IBI's facility. IBI's complaint in the adversary proceeding alleged four causes of action. The first cause de-

manded that Lloyd's, pursuant to a liability insurance policy it issued to IBI, (i) consent to pay for the costs IBI incurs in defending against certain claims asserted by the Banks against IBI concerning the alleged shortage, and (ii) indemnify both IBI and the Banks for any losses arising from the shortage. The second and third causes of action respectively sought recovery of two set-offs instituted by Natwest to compensate itself for the alleged shortage, on the ground that the set-offs are preferences. The fourth cause of action alleged unfair competition and tortious interference with business claims against Natwest and Revere. Numerous cross-claims and counter-claims also were filed in the adversary proceeding, *see In re IBI Security*, 174 B.R. at 667, but are not relevant to the issues presently before the court. The law firm of Mangone & Schnapp, which had been debtor's counsel in the adversary proceeding, was retained by the Trustee as special counsel to continue prosecuting the Natwest Litigation.

On February 5, 1993, BII and Glenfed Financial Corp. ("Glenfed") entered into an agreement whereby Glenfed assigned all of its rights and interests in the debtor's assets to BII, in exchange for $200,000 (the "Glenfed Assignment"). Glenfed was a secured creditor, holding liens on the debtor's accounts receivable and causes of action, as well as a replacement lien encumbering the debtor's assets in the amount of $574,583.79. According to BII, as a result of the assignment it became a secured creditor of the debtor's estate in the amount of $720,000, holding a security interest in, among other things, the debtor's causes of action in the Natwest Litigation.

BII's president, Michael Shields, is the son of IBI's president, Harold F. Shields. Immediately after the assignment, Michael Shields and the other principals of BII sent letters to IBI's customers informing them that BII had purchased the assets of IBI and would continue IBI's business. Towards this end, BII took possession of and utilized IBI's assets, including IBI's armored cars, money processing equipment, and accounts receivable.

The Trustee challenged BII's actions, contending that BII's operation of the debtor's business after conversion of the bankruptcy case to Chapter 7(1) violated the automatic stay provisions of section 362 of the Bankruptcy Code, 11 U.S.C. § 362, and (2) gave rise to causes of action by the estate for subordination of BII's claims as well as monetary damages. BII responded that it acted appropriately and in accordance with its rights under the Glenfed Assignment.

BII and the Trustee eventually settled the dispute. Under the terms of a settlement agreement dated July 23, 1993 (the "BII Settlement"), the Glenfed Assignment was deemed valid and enforceable, subject to the terms of the BII Settlement. BII was entitled to an allowed secure claim against the estate in the amount of $720,000, which was reduced by $240,000 to account for (i) $280,000 in assets previously received by BII from the estate that were used to continue the debtor's business, less (ii) a $40,000 payment to the estate in accordance with the terms of a contemporaneous settlement between BII, the Trustee, and the Triborough Bridge and Tunnel Authority ("TBTA").[1] BII's allowed secured claim was, thus, reduced to $480,000.

The parties also agreed that BII would be permitted to collect all of the debtor's pre-petition accounts receivable, while the Trustee would seek to recover (1) all of the debtor's post-petition accounts receivable, and (2) any monies from the Natwest Litigation. In order to satisfy BII's claim, the parties decided on the following payment scheme, set forth in paragraphs 8 and 9 of the BII Settlement:

8. Any recovery made (a) by the estate from the Natwest Litigation or collection

---

1. On August 11, 1993, the Trustee, BII, and the TBTA executed a settlement agreement resolving the debtor's claims against the TBTA. TBTA owed IBI and BII $124,165.50 for services rendered. Under the terms of the TBTA Settlement, TBTA was to pay the debtor's estate $40,000, and the remaining $84,165.50 to BII. The TBTA Settlement was incorporated into the BII Settlement, pursuant to which the Trustee would receive the $40,000 payment. The payment to the Trustee was counted as a credit in favor of BII when its claim was reduced under the BII Settlement.

of post-petition accounts receivable and (b) all monies recovered by BII on the pre-petition accounts receivable shall be distributed and/or allocated as follows:

a. The first $150,000 shall be paid to BII in reduction of the BII Secured Claim.

b. The next $100,000 shall be paid to the estate.

c. All sums collected thereafter shall be paid to BII until payment in full of the balance of the BII Secured Claim.

9. In addition to payment of the BII Secured Claim, BII shall receive 25% of the net proceeds recovered in the Natwest Litigation after payment of all attorneys fees, costs and expenses attendant thereto.

The bankruptcy court approved the BII Settlement on September 16, 1993.

## 2. The Natwest Litigation Settlement

On June 29, 1994, the Trustee, Natwest, First Fidelity, and Bowie, on behalf of Lloyd's, partially settled the Natwest Litigation (the "Natwest Settlement"). In addition to an exchange of mutual general releases between each of the parties and Lloyd's, a limited release of the Trustee by Natwest, and dismissal of the settled claims, Lloyd's agreed to pay each of the parties as follows: $375,000 to the Trustee; $1.1 million to Natwest; and $150,000 to First Fidelity. Payments were to be made directly to the parties. The only claim not settled by the Natwest Settlement was IBI's fourth cause of action against Natwest and Revere, alleging unjust competition and tortious interference with IBI's business.

The Natwest Settlement further provided that its terms, releases and notices of dismissal were binding on IBI and BII. Specifically, the agreement provided that all of the rights that BII possessed in the debtor's settled claims against Lloyd's and Natwest by virtue of the BII Settlement were to attach to the $375,000 payment by Lloyd's to the Trustee.

## 3. Proceedings before the Bankruptcy Court

The Natwest Settlement was offered to the bankruptcy court for approval. BII filed an objection to the settlement, claiming that while it did not object to the substance of the settlement, it strongly objected to the method of distributing the settlement proceeds with respect to the $375,000 payment to the Trustee. According to BII, under the terms of the BII Settlement the first $150,000 of Lloyd's payment is payable to BII, the next $100,000 is payable to the estate, and the remaining $125,000 is payable to BII. Consequently, BII contended that it was entitled to receive $275,000 of the $375,000 payment to the Trustee towards satisfaction of its $480,-000 secured claim against the estate. Because the Trustee sought to have attorneys' and accountant's fees paid from the $375,000 settlement payment prior to distributing the proceeds to BII in accordance with the BII Settlement scheme, BII argued that the Natwest Settlement payment method subjected the satisfaction of its secured claim to administrative expenses, in violation of the BII Settlement.

After conducting a hearing on BII's objections to the Natwest Settlement, the bankruptcy court, as explained in more detail below, concluded that the Natwest Settlement directly benefited BII. Consequently, it held that the Trustee was entitled to retain certain administrative expenses for professional fees and expenses from the Lloyd's payment pursuant to section 506(c) of the Bankruptcy Code, 11 U.S.C. § 506(c), prior to paying BII under scheme devised in the BII Settlement. The bankruptcy court approved $191,757.13 in professional fees and related expenses submitted by the Trustee's attorneys and accountants, and determined that 50 per cent of the fees and expenses should be attributable to BII because it was the secured creditor receiving a primary benefit from the Natwest Settlement. Accordingly, the court ordered that the sum of $95,878.56 be set aside by the Trustee for payment to the professionals, and that the remaining amount from Lloyd's $375,000 payment to the Trustee, namely $279,121.44, be distributed pursuant to the terms of the

BII Settlement, as follows: $150,000 to BII; the next $100,000 to the estate; and the remaining $29,121.44 to BII.

BII now appeals from the bankruptcy court's orders respectively approving the Natwest Settlement and authorizing the Trustee to distribute the settlement proceeds in the manner described above. BII contends that its secured claim should not have been subjected to administrative expenses, and that it was entitled to a payment of $275,000 under the terms of the BII Settlement from the $375,000 paid to the Trustee by Lloyd's. It further contends that payment of one half of the professional fees and expenses was unreasonable.

### Discussion

The bankruptcy court's findings of fact are reviewed for clear error, while its legal conclusions are reviewed *de novo*. *See Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 988 (2d Cir.1990); *In re Davis*, 169 B.R. 285, 292 (E.D.N.Y.1994).

### 1. Recovery of professionals' fees under 11 U.S.C. § 506(c)

The Trustee claims that he is entitled to recover the professionals' fees pursuant to section 506(c) of the Bankruptcy Code. That section provides that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c).

 Ordinarily, the bankruptcy estate's administrative expenses are not recoverable from secured claimholders, because the trustee acts for the benefit of the estate and the unsecured creditors. *See General Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73, 76 (2d Cir.1984) (*"Flagstaff I"*) (citing *In re Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir. 1982)). However, section 506(c) provides an exception to the general rule when the trustee seeks to recover administrative expenses that are expended primarily for the benefit of

the secured creditor, or where the secured creditor caused or consented to the payment of such expenses. *See General Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*, 762 F.2d 10, 12 (2d Cir.1985) (*"Flagstaff II"*) *Trim-X*, 695 F.2d at 301. *See generally*, L. King, *4 Collier on Bankruptcy*, ¶ 506.04 at 506–48 (15th Ed.1996).

 The burden in this case is on the Trustee to show that the administrative expenses are recoverable under section 506(c). *See Flagstaff I*, 739 F.2d at 77. That burden is met by showing that the expenses were (1) necessary, (2) reasonable, and (3) "expended primarily for the benefit of the [secured] creditor and that the creditor directly benefited from the expenditure." *Flagstaff II*, 762 F.2d at 12; *Trim-X*, 695 F.2d at 299.

BII claimed below, as it does on appeal, that section 506(c) was not applicable to the present controversy, because under the BII Settlement its secured claim was not subject to any administrative expenses. According to BII, the BII Settlement provided for a payment to the Trustee of $140,000 ($40,000 from the TBTA Settlement and $100,000 under the payout scheme set forth in paragraph 8 of the agreement) that was to be used to pay for expenses associated with the Natwest Litigation. BII claims that the $140,000 payment is, thus, a "carve out" from the cash collateral used to satisfy BII's claim, and as such the remainder of the money to be paid to it under paragraph 8 of the BII Settlement is not subject to administrative expenses.

In support of its contention, BII made three arguments that it reiterates on appeal. First, it argued that the plain language of paragraph 8 of the BII Settlement provides that BII is to be paid the first $150,000 from any recovery made by the Trustee in the Natwest Litigation, the Trustee is to be paid the next $100,000, and that all other monies thereafter recovered by the Trustee in that litigation are to be paid to BII until its claim is fully satisfied. BII emphasized that nowhere in paragraph 8 does it state that the payments to BII are subject to administrative expenses. In contrast, BII cited to the language of paragraph 9, which specifically provides that in addition to payment of BII's

secured claim, it is to receive 25 percent of the net proceeds recovered in the Natwest Litigation after payment of attorneys' fees and costs. Second, BII contended that the parties' past practice under the BII Settlement shows that payments made to BII were not treated as subject to administrative expenses. Specifically, BII pointed to the $80,-165.50 payment by the TBTA, which was made directly to BII and not through the Trustee, and which was not subject to administrative expenses. Third, BII argued that the Trustee had referred to the $140,000 payment to him under the BII Settlement as a "carve out," which, according to BII, is a term of art denoting use of a secured creditor's cash collateral to pay administrative expenses.

BII further claimed that its position was supported by the Second Circuit's decision in *Flagstaff I & II*. In that case, the secured creditor entered into a financing agreement with the debtor, whereby any loans made to the debtor were secured by a super-priority lien on all of the estate's present and future property. That lien explicitly was exempt from payment of the kinds of administrative expenses specified in section 503(b) of the Bankruptcy Code, 11 U.S.C. § 503(b). Section 503(b) expenses include interim awards of professionals' fees. Despite the explicit terms of the financing agreement, the bankruptcy court ordered that interim attorneys' and accountants' fees be paid from the encumbered collateral. The district court affirmed the order. The Second Circuit reversed, holding that under the explicit terms of the financing agreement the creditor's lien was given a super-priority status under section 364(c)(1) of the Bankruptcy Code, 11 U.S.C. § 364(c)(1), and that, as such, the lien was not subject to payment of the professionals' fees specified in section 503(b). The Circuit court also held that the professional fees only could be recovered under section 506(c) if they were incurred primarily for the benefit of the secured creditor, or if the creditor consented to bearing the costs of the professionals' services. *See Flagstaff I*, 739 F.2d at 76–77. According to BII, the BII Settlement, like the financing order at issue in *Flagstaff I & II*, created a super-priority

status for its secured claim exempting the claim from administrative expense payments.

The bankruptcy court was unpersuaded by BII's arguments. The court specifically concluded that the professionals' fees were directly incurred for the purpose of pursuing the Natwest Litigation and achieving the Natwest Settlement, and that BII was the primary recipient and beneficiary of the funds flowing from the Natwest Settlement. It further held that the language of the BII Settlement did not afford BII's claim super-priority status, because the agreement did not specifically provide that the claim was not subject to administrative expenses and that the Trustee was surrendering his rights under section 506(c) to recover such expenses. For this reason, the bankruptcy court distinguished the situation in *Flagstaff I & II*, where the financing agreement at issue explicitly provided that the creditor's lien had priority over administrative expenses such as professionals' fees.

The court also rejected BII's argument concerning the parties' alleged past practice of paying BII settlement proceeds that are not subject to professional fees. The court pointed out that after BII entered into the BII Settlement, it retained the law firm of Mangone & Schnapp, the Trustee's special counsel, to recover the debtor's pre-petition accounts receivable. Under the retainer agreement, BII agreed to pay Mangone & Schnapp's fees prior to receiving any of the recovered receivables. The court explained that if the BII Settlement truly gave BII's claim super-priority status, then there was no reason for BII to agree to pay counsel's fees under the retainer. Finally, the court declined to accept BII's explanation that the $140,000 was a "carve out" designated for Natwest Litigation expenses. According to the bankruptcy court, BII's explanation assumed that the Trustee obtained the "carve-out" solely for the benefit of the professionals, rather than in fulfillment of his primary duty—to receive as many assets into the estate for ultimate distribution to creditors, including the unsecured creditors.

■ This Court also is unpersuaded by BII's contentions on appeal. Practically all of the expenses at issue were incurred in

relation to the debtor's and Trustee's prosecution and settling of the Natwest Litigation. Further, any recovery by the Trustee in that litigation inured to the direct benefit of BII, because it held a secured claim over the debtor's causes of action pursuant to the Glenfed Assignment, which the BII Settlement recognized as valid. Finally, by virtue of the BII Settlement payment scheme, BII was to be the primary recipient of any funds recovered by the Trustee in the Natwest Litigation. Thus, under section 506(c), the Trustee can recover administrative expenses prior to distribution of the settlement proceeds to BII, because the professionals' fees "were expended primarily for the benefit of the creditor and ... the creditor directly benefited from the expenditure. " *Flagstaff II*, 762 F.2d at 12. *Accord In re Croton River Club, Inc.*, 162 B.R. 656, 659 (Bankr. S.D.N.Y.1993).

■ BII's contentions regarding the language of the BII Settlement are likewise unavailing. The absence of any language in that settlement agreement explicitly stating that (1) the $140,000 payment to the Trustee is a "carve out" designated for payment of professionals' fees in the Natwest Litigation, or (2) satisfaction of BII's secured claim pursuant to the scheme set forth in paragraph 8 of the agreement is not subject to any administrative expenses, indicates that the parties did not agree to any such terms. In this respect, the bankruptcy court correctly distinguished the situation in *Flagstaff I & II*, where the secured creditor and the debtor had entered into an agreement explicitly providing for the priority of the creditors' claim over professionals' fees and expenses. *See also Croton River Club*, 162 B.R. at 660 (where secured creditor entered into a cash collateral stipulation with the debtor to preserve the going concern value of its collateral without obtaining a super-priority interest, attorneys' fees and costs associated with the stipulation are recoverable pursuant to section 506(c)).

Accordingly, the bankruptcy court's conclusion that the Trustee could recover professionals' fees from the payment by Lloyd's to him under the Natwest Settlement prior to distributing the settlement proceeds to satisfy BII's claim under the terms of the BII Settlement, neither is erroneous as a matter of law nor premised on clear errors of fact.

## 2. Reasonableness of the professionals' fees imposed

■ Based on this Court's review of the interim fee applications submitted by the professionals, and the time records attached thereto, the bankruptcy court's finding that practically all of the attorneys' and accountants' fees it awarded were expended in pursuit of the Natwest Litigation and Settlement is not clearly erroneous. These expenses included: (1) $40,373 in fees and $1,231.67 in expenses awarded to the Trustee's general counsel, the law firm of Goldman, Horowitz & Cherno, (2) $11,862.50 in fees and $62.56 in expenses awarded to the Trustee's accountants, the firm of Sandler, Rosengarten, Dennis & Berger; and (3) $135,024.60 in fees and $3,202.80 in expenses awarded to the Trustee's special counsel, the law firm of Mangone & Schnapp. Moreover, the bankruptcy court's decision to have BII and the Trustee share in the payment of these fees and expenses, $191,757.13 in total, on an equal basis is reasonable given that both the estate and BII benefited from pursuing the Natwest Litigation and Settlement, and it would be unfair to have either party bear the entire cost of the awarded professionals' fees.

### *Conclusion*

For the reasons stated above, the orders of the bankruptcy court dated August 18, 1994, (1) "Approving Settlement Agreement, Authorizing Trustee, and Having Certain Claims Attach to Proceeds," and (2) "Determining and Authorizing Distribution of Certain Settlement Proceeds Paid to Chapter 7 Trustee," are affirmed.

The Clerk of the Court is advised that this action closes the case.

**SO ORDERED.**